WEAVERTOWN TRANSPORT
LEASING, INC., Appellee,

v.

Daniel MORAN, Appellant.

Superior Court of Pennsylvania.

Argued Aug. 28, 2003.
Filed Oct. 15, 2003.

James L. Moran, Erie, for appellant.

James A. Marchewka, Canonsburg, for appellee.

BEFORE: JOHNSON, HUDOCK and ORIE MELVIN, JJ.

OPINION BY JOHNSON, J.:

¶ 1 In this case, we are asked whether a company's payment of season ticket license fees to a professional sports franchise pursuant to an oral agreement between a company and its employee constitutes consideration, where the sports franchise would have no right to recover against the company who furnishes the fee. We hold that it does not because the sports franchise is merely an incidental beneficiary, payment to whom, without more, cannot serve as consideration between the company and its employee. Moreover, promissory estoppel fails to support the trial court's finding of a binding oral contract in favor of the company. Consequently, we reverse.

¶ 2 It is not surprising, in a case concerning the existence of an oral contract, that the parties dispute many facts crucial to its disposition. The record is inconclusive, and much hinges on witness credibility. Because the trial court's assessment of witness credibility governs most findings of fact pertinent to this case, we must accept those facts as found by the trial court. See *Commonwealth v. Rochon*, 398 Pa.Super. 494, 581 A.2d 239 (1990) (holding that this Court will not disturb fact-finder's witness credibility determinations where evidence is conflicting; fact-finder may believe all, part, or none of the testimony). These we set forth below.

¶ 3 In July of 2000, Appellant–Defendant Daniel Moran (Moran), a certified public accountant, accepted employment as controller for Appellee–Plaintiff Weavertown Transport Leasing, Inc. (Weavertown or Company). That summer, the Pittsburgh Steelers National Football League franchise (Steelers) prepared to relocate from Three Rivers Stadium to its new home, Heinz Field. Moran, a long-time season ticket-holder to Steelers' home games at Three Rivers Stadium, was offered four season tickets to Heinz Field comparable to his seats at Three Rivers Stadium as well as the opportunity to secure additional seats. Moran paid $11,000 for thirty-year licenses to the four seats that corresponded to his former seats. He also agreed to purchase seven-year licenses to four Club–Level seats, which cost $3,840. The purchase agreements precluded Moran from selling or transferring his licenses to an-

other party for at least one year after purchase, but allowed for transfer thereafter.

¶ 4 While these transactions took place, Moran began employment as Weavertown's controller. Soon after his arrival, he learned through Weavertown's President, Dawn Fuchs–Heiser, that the Company sought full ownership of season tickets to Heinz Field to entertain its clients. These tickets would augment the Company's season tickets to see the Pittsburgh Penguins (National Hockey League) at Mellon Arena and the Pittsburgh Pirates (Major League Baseball) at PNC Park. In prior years, the Company had purchased tickets to many Steelers home games on a per-game basis from another holder of season tickets. For the 2001/2002 season, Fuchs–Heiser agreed to buy them from Moran.

¶ 5 The parties dispute the nature of the agreement Moran and Fuchs–Heiser reached on behalf of Weavertown. The trial court, however, found unequivocally that Moran "offered to sell both the seat license fee to [Weavertown] and the accompanying season tickets for the Steelers to [Weavertown] and to transfer the seat license from his name to that of [Weavertown] when the Steelers would permit [Moran] to do so." Trial Court Opinion (T.C.O.), 12/6/02, at 3. To that end, Weavertown wrote checks totaling $3,840 to the Stadium Building Fund (SBF) for the license fees corresponding to four Club Level seats, and then wrote a check for $5,804 to the Steelers for the face value of the 2001/2002 season tickets. These checks were delivered to Moran, who in turn sent them to the appropriate bodies. When he received the tickets he gave them to the Company. When the Steelers earned a playoff berth at the end of the 2001/2002 season, Weavertown purchased seats for those games for $1,283—again by giving a check to Moran who delivered it to the appropriate Steelers office.

¶ 6 On May 11, 2001, before the Steelers began their first season at Heinz Field, Moran resigned his position with Weavertown. He nonetheless in no way interfered with Weavertown's usage of the seats in dispute throughout that season and during the playoffs. After the 2001/2002 NFL playoffs, in the spring of 2002, Fuchs–Heiser asked Moran when he would be able to transfer the licenses to Weavertown. Moran denied that he had ever intended to transfer the licenses. He did, however, tender a check to Weavertown equal to six-sevenths of the seat license fee Weavertown had furnished to the SBF—ostensibly to offset, on a *pro rata* basis, the license fees for the six years remaining on the licenses. Weavertown rejected the offer and initiated this action.

¶ 7 The trial court rejected Moran's argument that the asserted oral contract failed for want of consideration. It counted Weavertown's payments to SBF and the Steelers as payments to third parties constituting consideration. Thus, the court found that an oral contract existed between Weavertown and Moran. The court ordered specific performance, directing Moran to transfer the seat licenses and any outstanding Steelers tickets purchased under those licenses. From this order, Moran appeals presenting the following question:

WHETHER THE LOWER COURT ERRED IN CONCLUDING THAT AN ENFORCEABLE ORAL CONTRACT EXISTED AND THAT A SALE TOOK PLACE WHEN THERE WAS NO BARGAINED–FOR AGREEMENT ENTERED INTO BETWEEN THE PARTIES AND THE APPELLANT RECEIVED NO BENEFIT?

Brief for Appellant at v.

¶ 8 Our standard of review requires us to determine, based on all the evidence,

whether the trial court properly applied contract principles. We will not usurp the trial court's fact-finding function, and will intercede only where the trial court committed an error of law or an abuse of discretion. *See Sams v. Sams*, 808 A.2d 206, 210 (Pa.Super.2002).

¶ 9 A contract is formed when the parties to it 1) reach a mutual understanding, 2) exchange consideration, and 3) delineate the terms of their bargain with sufficient clarity. *See Geisinger Clinic v. DiCuccio*, 414 Pa.Super. 85, 606 A.2d 509, 512 (1992). Consideration consists of a benefit to the promisor or a detriment to the promisee. *See Stelmack v. Glen Alden Coal Co.*, 339 Pa. 410, 14 A.2d 127, 128 (1940).

> It is not enough, however, that the promisee has suffered a legal detriment at the request of the promisor. The detriment incurred must be the 'quid pro quo', or the 'price' of the promise, and the inducement for which it was made.... If the promisor merely intends to make a gift to the promisee upon the performance of a condition, the promise is gratuitous and the satisfaction of the condition is not consideration for a contract. **The distinction between such a conditional gift and a contract is well illustrated in Williston on Contracts, Rev.Ed., Vol. 1, Section 112, where it is said: 'If a benevolent man says to a tramp,—'If you go around the corner to the clothing shop there, you may purchase an overcoat on my credit,' no reasonable person would understand that the short walk was requested as the consideration for the promise, but that in the event of the tramp going to the shop the promisor would make him a gift.'**

*Id.* at 128–29 (emphasis added; case citations omitted).

¶ 10 Moran contends that he received no consideration for the season tickets and seat licenses due to Weavertown's lack of obligation to the Steelers. Brief for Appellant at 6–12. Instead, he argues that his arrangement with Weavertown was gratuitous, conditioned on Weavertown's standing in his place by paying the amounts due the Steelers and SBF for the seats in question. Brief for Appellant at 10–11 (citing *Fedun v. Mike's Café*, 204 Pa.Super. 356, 204 A.2d 776 (1964)). He effectively illustrates his point by observing that, "[i]f the season tickets, for some reason, were no longer valuable, and Weavertown didn't want them anymore, it is Moran who is obligated to the Pittsburgh Steelers, not Weavertown." Brief for Appellant at 11. This language goes to the heart of the consideration requirement and illustrates why SBF and the Steelers are merely incidental beneficiaries.

¶ 11 The trial court found consideration in Weavertown's payments to the Steelers and SBF, as third-party beneficiaries, T.C.O., 12/6/02, at 5–6, but it cited no authority supporting its particular application of the third-party beneficiary rule. In general, of course, the trial court accurately stated the law. *See Bucks County Bank & Trust Co. v. DeGroot*, 226 Pa.Super. 419, 313 A.2d 357, 359 (1973) ("A benefit to a third person is sufficient consideration to sustain a promise."). It failed, however, to properly consider the attenuation between the Steelers and Weavertown, and the latter's lack of obligation to the former.

¶ 12 In *Guy v. Liederbach*, our Supreme Court adopted the RESTATEMENT (SECONDS) CONTRACTS § 302 (stating the rule for when a third party is in fact a third-party beneficiary entitled to enforce a contract between other parties). *See* 501 Pa. 47, 459 A.2d 744, 751 (1983). It dis-

tilled the RESTATEMENT inquiry into the following two-part test:

(1) the recognition of the beneficiary's right must be appropriate to effectuate the intention of the parties, and (2) the performance must satisfy an obligation of the promisee to pay money to the beneficiary or the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.

*Id.* (internal quotation marks omitted). A party who does not satisfy the above test is an incidental beneficiary without the right to enforce an agreement, and as such cannot suffice to support consideration.

¶ 13 The trial court's failure to cite authority for its finding does not benefit by Weavertown's citation to one inapposite case. Brief for Appellee at 3 (citing *DeGroot,* 226 Pa.Super. 419, 313 A.2d 357 (1973)). In *DeGroot,* the parties secured notes earmarked to go directly to their friend who needed financial assistance. *See DeGroot,* 313 A.2d at 358. This Court rejected the DeGroots' claim that the arrangement lacked consideration, noting that "the DeGroots received exactly what they expected from the transaction in that the proceeds from their loans went to pay off [their friend's] various obligations ...." *Id.* at 359. Here, however, the arrangement reached between Weavertown and Moran did not aim to benefit SBF or the Steelers, thus neither SBF nor the Steelers were in the same position as the DeGroots' needy friend.

¶ 14 The RESTATEMENT offers an example analogous to the matter at hand: "B contracts with A to buy a new car manufactured by C. C is an incidental beneficiary, even though the promise can only be performed if money is paid to C." RESTATEMENT (SECONDS) CONTRACTS § 302, Cmt., Illustration 17. We conclude that the Steelers and SBF are Incidental bene-

ficiaries, payment to whom could not constitute consideration adequate to affirm the trial court's ruling.

¶ 15 Even Weavertown conceded the absence of consideration at trial, where the following exchange occurred between Weavertown and the court.

[The Court]: What are you alleging as consideration or are you alleging no consideration is needed?

[Weavertown]: I'm alleging no consideration is needed in this matter, Your Honor, that Mr. Moran came to them with an offer to buy these tickets, the license had to be paid, and that actually can be the consideration, that in order to get these season tickets, the license fee had to be paid, Your Honor. My clients did pay that license. So I think a claim has been made and I think the case should go forward.

[The Court]: I don't think anyone is disputing that, that they paid for the license.

[Weavertown]: I understand that, Your Honor.

[The Court]: Can you cite a case on why no consideration is needed in this?

[Weavertown]: No, your honor.

Notes of Testimony (N.T.), 10/29/02, at 52–53.

¶ 16 Weavertown has more in common with Williston's "tramp" than it does with a promisee obliged to a third-party: Weavertown's payments directly to SBF and the Steelers set up Moran's conditional gift granting Weavertown access to four Club Level seats at Heinz Field; SBF and the Steelers were incidental beneficiaries, the benefit to whom cannot be consideration. That Moran arranged it so that Weavertown bore the initial burden of paying the seat licenses does not change the general character of the transaction, as demonstrated by Moran's unsolicited pre-litiga-

tion offer to repay sixth-sevenths of the license fees to Weavertown. Thus, we find no consideration in the arrangement between Moran and Weavertown.

■ ¶ 17 Courts, however, may find a surrogate for consideration under the doctrine of promissory estoppel. *Cf. Robert Mallery Lumber Corp. v. B. & F. Assoc., Inc.*, 294 Pa.Super. 503, 440 A.2d 579, 582 (1982) (noting that Judge Learned Hand considered promissory estoppel to be a "recognized species of consideration," while Justice Cardozo countervailingly thought it "a substitute for consideration"). Notwithstanding the foregoing colloquy, in which Weavertown seemed to imply a promissory estoppel argument, the trial court did not reach that matter in its opinion, presumably because its finding of adequate consideration made further discussion superfluous. Because we find that the trial court erred in its finding of consideration, we address whether promissory estoppel, which Weavertown briefed, Brief for Appellee at 3–5, provides an alternative basis on which to affirm the trial court's order. *See Keystone Spray Equip., Inc. v. Regis Ins. Co.*, 767 A.2d 572, 576 (Pa.Super.2001) (holding that where the trial court reaches a correct disposition, this Court can affirm on any basis).

■ ¶ 18 This Court has stated the promissory estoppel doctrine as follows:

■ a promise [2] which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and [3] which does induce such action or forbearance is binding if [4] injustice can be avoided only by the enforcement of the promise.

*Fedun*, 204 A.2d at 782; *see Stelmack*, 14 A.2d at 129 (quoting RESTATEMENT CONTRACTS § 90). The doctrine, however, cannot be "loosely applied; if it were, any promise, regardless of the complete ab-

sence of consideration, would be enforceable." *Fedun*, 204 A.2d at 782; *see Stelmack*, 14 A.2d at 129.

■ 19 We find that Moran's arrangement with Weavertown did not induce Weavertown to act or forbear in a way sufficiently "definite and substantial" to warrant application of estoppel principles. Weavertown contends that it "gave up the ability to pursue [season ticket licenses] through other avenues because of [its] reliance upon Mr. Moran's oral promise to transfer [his] tickets ...." Brief for Appellee at 4. The record does not support this claim. On cross-examination, Fuchs–Heiser conceded that Weavertown never had an opportunity to secure seat licenses.

> [Moran]: Finally, ma'am, so that I understand this, it's your testimony today that you had an opportunity to buy other tickets from the Pittsburgh Steelers other than these tickets that Mr. Moran had?
>
> [Fuchs–Heiser]: Oh, no, I never said the word Pittsburgh Steelers in there. That is not what I said. I could buy them from clients, contacts. I have access to get additional seats. Not through the Pittsburgh Steelers.
>
> [Moran]: So that it's clearly your testimony that you didn't have the opportunity to enter into a licensing agreement with the Steelers to buy tickets; right?
>
> [Fuchs–Heiser]: That's correct.
>
> [Moran]: And to be the owner of tickets?
>
> [Fuchs–Heiser]: That's correct.

N.T., 10/29/02, at 33–34. Weavertown therefore declined no opportunities comparable to the one it seeks to enforce here in reliance on Moran's asserted promise. Rather, it proceeded as it had been doing prior to Moran's offer: buying tickets on a per-game basis from season ticket holders. To support an estoppel claim, under Penn-

sylvania's restrictive standard, Weavertown would have to show that it declined a "definite and substantial" opportunity to purchase seat licenses and that it did so in its reliance on Moran's promise. It asserts both propositions, but the evidence supports neither. Thus we find Weavertown's estoppel argument unavailing.

¶ 20 For all the foregoing reasons, the trial court erred in finding adequate consideration to support an oral contract in the gratuitous arrangement between Moran and Weavertown. Moreover, we find no support for the trial court's order under alternative rationales. Thus, we must reverse the trial court's order. We recognize, however, that Moran should not receive the benefit of the remaining years on the seat licenses in question without reimbursing Weavertown as the trial court deems appropriate. *Cf. Rayle v. Bowling Green State Univ.*, 108 Ohio Misc.2d 60, 739 N.E.2d 1260, 1262 (Ct.Cl.2000) ("The court finds that it is reasonable to value plaintiff's interest in the two seat licenses at the price he paid for them .... Defendant was within its right to refund plaintiff's original ... investment and reallocate his seats ....."). Thus, we remand for further proceedings consistent with this Opinion.

¶ 21 Order **REVERSED.** Case **REMANDED.** Jurisdiction **RELINQUISHED.**